William L. Elkins, P. A. B. Widener, George W. Elkins (of Pittsburg), William Flinn, Joshua Rhodes and M. K. McMullin, Appellants, *v.* J. Pierpont Morgan, George C. Thomas, C. H. Coster, George S. Bowdoin, Edward T. Stotesbury, James W. Paul, Jr., Robert Bacon, J. Pierpont Morgan, Jr., Temple Bowdoin and Edward M. Robinson, trading as Drexel & Co.; G. I. Whitney and F. L. Stephenson, trading as Whitney & Stephenson.

*Principal and agent—Corporations.*

Where the owners of shares of several small street railway companies agree with a firm of brokers to deposit their shares with a firm of bankers, and receive therefor the cash equivalent of preference shares of a new corporation to be formed by the consolidation of the smaller companies, and the brokers agree to raise, by subscriptions to the preference shares, the cash with which to pay the owners of the railway stock, and the bankers, from their knowledge of the project and all the circumstances of the case, must have known that the brokers were not the purchasers or owners of this stock, and said brokers afterwards undertake to release said bankers and all the subscribers to preference stock, the court, on a bill in equity by the owners of the stock against the brokers and bankers and subscribers to the preference stock, will find as a fact that the brokers were the agents of the owners of the stock, and not independent contractors or purchasers.

Argued Jan. 25, 1899. Appeal, No. 256, Jan. T., 1898, by plaintiffs, from decree of C. P. No. 4, Phila. Co., March T., 1897, No. 376, on bill in equity. Before STERRETT, C. J., GREEN, MITCHELL, DEAN and FELL, JJ. Reversed.

Bill in equity to compel the payment of subscriptions to the stock of a corporation.

The facts appear by the opinion of the Supreme Court.

*Error assigned* was the decree of the court dismissing the bill.

*John G. Johnson*, for appellants.

*Richard C. Dale*, with him *Francis Lynde Stetson* and *Samuel Dickson*, for Drexel & Co., appellees.

*J. H. Reed*, of *Knox & Reed*, for Whitney & Stephenson, appellees.

OPINION BY MR. JUSTICE DEAN, March 27, 1899 :

A bill was filed in the court below against Whitney & Stephenson and Drexel & Company, by the plaintiffs and others interested with them in carrying out what is called a syndicate agreement, relating to the sale of the stocks of a number of street railways in Pittsburg and Allegheny county to a new company called the "Consolidated Traction Company of Pittsburg." Appellants were the owners of a large number of shares in smaller companies, which latter in some cases held valuable leases of other railway companies. Whitney & Stephenson were brokers, doing business in Pittsburg. They either owned or controlled a majority of the shares of the Central Traction Company, one of the smaller companies, while appellants, as noticed, owned or controlled a majority of the shares in the Pittsburg, Duquesne, Fort Pitt, Allegheny Traction and other smaller companies. The project contemplated a sale of the shares of the smaller or, as designated in the proceedings, the "underlying companies" to the Consolidated Traction Company.

The bill averred that Whitney & Stephenson, acting for appellants and others, owners of the shares of these underlying companies, had made sale of their shares to the Consolidated Traction Company, to be paid for in the preferred shares of the latter company, these shares to be taken up by cash, to be paid by Drexel & Company, with whom the underlying shares were to be deposited, on or before October 1, 1896 ; after that date, so far as the preferred shares had not been sold by Drexel & Com-

pany, they were to be taken up by certain syndicate subscribers. The bill further averred that these syndicate subscribers had entered into an agreement with Whitney & Stephenson, and that the latter, as "syndicate managers" in making the agreement, were the agents of appellants and other holders of the underlying shares. The bill further averred that Whitney & Stephenson, in September, 1896, had attempted to release the syndicate subscribers, including Drexel & Company, from the obligations they had assumed, without the assent of appellants and in violation of their rights.

There were three written agreements between Whitney & Stephenson and the Consolidated Traction Company, dated respectively, the 3d of March, the 6th and 18th of April, 1896. These agreements were, in effect, contemporaneous, for the subsequent ones were but modifications of the first; in fact they seem to represent, to some extent, the different phases of the negotiations as they proceeded, until the minds of the parties met finally in all details in the last one, that of April 18.

On April 11, Whitney & Stephenson entered into a contract with Drexel & Company, reciting the material parts of the agreements with the Consolidated Traction Company, and that they had agreed with the parties from whom the shares of the different underlying companies had been purchased, that these shares should be deposited with Drexel & Company, who should issue to the holders their negotiable receipts for the shares so purchased, stipulating for the right of the holders to receive payment therefor, a designated price, on or before October 1, 1896, from Drexel & Company, either cash or preferred shares of the Consolidated Traction Company. The agreement also stated that, in consideration of 77,000 shares of common stock of the Consolidated Traction Company, to be marked $45.00 paid, Drexel & Company would use their best endeavors to make an issue and sale prior to the 1st day of October, 1896, of the preferred shares of said Consolidated Traction Company of Pittsburg, at a price not less than par and accrued interest from April 1, 1896; that any premium less than five per cent should be retained by Drexel & Company; that any premium in excess of five per cent should be divided equally between Drexel & Company and Whitney & Stephenson; and that such of the preferred shares as should remain on October 1, 1896,

unsold, should be delivered by Drexel & Company to the holders of such of their certificates of deposit as should not have been redeemed in cash.

An agreement was entered into, bearing date April 20, 1896, between Whitney & Stephenson, termed "Syndicate Managers," and certain persons, termed "Syndicate Subscribers," which recited that the "Syndicate Managers" had entered into an agreement with the Consolidated Traction Company of Pittsburg to purchase the shares therein named at designated prices; that they had secured the assistance of Drexel & Company in making an issue of preferred shares, to the end that the same might be sold for the largest possible price, and that the "Syndicate Managers," in advance of the making of the offer of said preference shares to Drexel & Company, were prepared to receive subscriptions to certain of the common stock of the Consolidated Traction Company, subject to the payment of $5.00 per share thereon, upon conditions specified. By this agreement it was provided that each syndicate subscriber subscribed for so many shares of the common stock of said Consolidated Traction Company of Pittsburg as might be set down in his own handwriting opposite his name, subject to the condition that the total amount of common stock to be submitted for subscription was to be limited to 73,000 shares; that $5.00 should be paid upon each share by the subscriber on the 10th day of May, 1896, to the Consolidated Traction Company; and that if, upon the 25th day of September, 1896, "any of the preference shares of the Consolidated Traction Company, to be included in the offer of Drexel & Company, remain unsold, said subscribers will, within five days thereafter, upon being notified, accept from Drexel & Company, and pay cash therefor at par, so many of the preference shares of said Consolidated Traction Company remaining in the hands of Drexel & Company undisposed of, as shall be equal to twice the number of common shares subscribed for by each of such 'Syndicate Subscribers,' respectively."

This agreement gave the right to any syndicate subscriber to purchase from Drexel & Company for cash, preference shares of the Consolidated Traction Company, at the selling price established by Drexel & Company, and to pay for the same by exchanging underlying shares therefor at such price. The sub-

scribers were to participate with Drexel & Company in the profits to be realized from the sale of the preference shares, at a price above 105, by taking an equal share thereof.

The evidence does not show what efforts were made by Drexel & Company to sell the preference shares ; it does show that they sold none, as appears by their letter to Whitney & Stephenson of September 16, 1896, as follows :

" Gentlemen : Referring to our agreement with you, which bears date April 11, 1896, we desire hereby to give you notice that we have used our best endeavors to make a sale of the preferred shares of the Consolidated Traction Company of Pittsburg, deposited with us under that agreement, at a price not less than par and accrued interest from April 1, 1896, but up to this time, owing to the disturbed financial condition of the country, we have found it impracticable to make any sales in accordance with the terms of the contract, and the entire amount of stock issued to us under that agreement still remains unsold. With your concurrence we would fix the price of the shares from this date on at par and accrued interest.

" Yours very truly,
" DREXEL & Co."

On the day following, Whitney & Stephenson sent to the syndicate subscribers a copy of this letter, and at the same time notified them that their obligation under the agreement of April 20, 1896, might be discharged on or before September 24, 1896, by the purchase from Drexel & Company of preferred shares of the Consolidated Traction Company at par and accrued interest from April 1, 1896, at the same time stating that the payment for such preferred shares might be made in cash or in Drexel & Company's receipts issued for stock of underlying companies. This notice was given with the knowledge and approval of Drexel & Company.

The complainants and others satisfied their subscriptions by taking preference shares deposited with Drexel & Company, pro tanto. After this had been done, Whitney & Stephenson, desiring, as complainants averred, to save themselves from loss which would result from liquidating the large number of subscriptions for which they were responsible, originally made or subsequently acquired, notified the syndicate subscribers, including Drexel &

Company and themselves, that they would be released from all further liability, upon payment of cash to the extent of twenty-five per cent of their subscriptions. At that time the preference shares were selling for about $38.00 per share. Immediately, upon learning that this had been done, the complainants notified such of the syndicate subscribers as were known to them, including Whitney & Stephenson and Drexel & Company, of their dissent, and of their demand, as principals of the syndicate managers, that the subscriptions should be paid in cash, as provided in the agreement.

We do not undertake to give in detail all the special averments of the bill or all the material stipulations in the written agreements, or the substance of the different written notices and communications; but what we have noted is an outline of plaintiffs' complaint, with some of the leading facts supporting it. The case turns on a question of fact. Defendants received from plaintiffs their underlying shares; and they received them by reason of their direct business relations with Whitney & Stephenson. Whom did the latter represent in this business transaction?

Whitney & Stephenson, in their answer, deny that they were acting for or on behalf of the complainants, and aver that they dealt with Drexel & Company for themselves as independent contracting parties, except in relation to the syndicate agreement, to which Drexel & Company were subscribing parties, and as to which they acted as syndicate managers, representing syndicate subscribers.

Drexel & Company, in their answer, deny "that they dealt with Whitney & Stephenson, as on behalf of the holders of shares of stock of said underlying companies, but on the contrary, these defendants, in the making of this agreement, dealt with Whitney & Stephenson in this entire transaction as independent contracting parties, acting for themselves alone, and for no other parties except in the matter of the syndicate agreement to which these defendants, among others, subscribed, in which agreement said Whitney & Stephenson acted as syndicate managers as representing the syndicate subscribers. Answering, therefore, upon the knowledge of these defendants so far as they have any knowledge in the premises, and upon information received, both in the course of the business and since, up to the

present time, from Whitney & Stephenson, these defendants do deny that Whitney & Stephenson, in making said agreement of April 11th, 1896, with Drexel & Co., were acting on behalf of the complainants or other holders of stock of said underlying companies."

This makes a clean cut issue of fact, and the burden is on the plaintiffs to establish the truth of their averments. The learned judge of the court below finds thus : " My judgment, after a very careful consideration of the whole case, is against the plaintiff's view of the question under consideration. On the whole, I think there is not sufficient evidence on which I could say that Whitney & Stephenson should be regarded, from the inception of the transaction, and through its manifold windings and experiments, as the agents or representatives of the plaintiffs."

After a most careful consideration of the numerous documents and voluminous testimony, we are constrained to adopt the conclusion, that this finding is erroneous ; not that it is merely against the weight of the evidence, for in such case we would not disturb it, but that it is manifestly incorrect.

What was the scope of the business project in contemplation of those who conceived and promoted this business enterprise? Undisputedly, it was to unite in one carrying corporation numerous smaller corporations doing business in the same locality. To accomplish such result the shares of the underlying companies, controlled by appellants, must be had ; they would not sell except for cash; the consolidated company could pay in its own shares, but not in cash; some arrangement must be made by which the securities of the purchasing company could be turned into cash for those who would receive nothing else ; the execution of such an arrangement would be impossible to the dozens of parties interested in the scheme ; it, necessarily, must be intrusted to some one who would represent them ; then, begin the negotiations and agreements with those planning the organization of the consolidated company, which was, to take up the underlying companies ; every agreement shows Whitney & Stephenson were selected as the active executive agents to accomplish this purpose ; they were the " go between " of the parties ; in all the writings they are styled the " Syndicate Managers," and nowhere in them is it intimated they are any

thing else.   In pursuance of the power intrusted to them, co-
temporaneously, they commence consultations and negotiations
with Drexel & Company, bankers of large financial ability;
consultations are had with them, progress reported to those in-
terested in the consolidated company, and suggestions for modi-
fications or changes in the different agreements made after
learning the imperative demands of plaintiffs.   After the syndi-
cate agreement was closed, complainants, acting on the represen-
tations of Whitney & Stephenson as to the facts, deposited their
underlying shares with Drexel & Company.   There is no doubt,
they expected, when they first assented to the arrangement,
that Drexel & Company would guarantee to them the cash for
the preference shares they were entitled to receive ; but Drexel
& Company refused to do so ; then they declined to surrender
their underlying shares ; whereupon, Whitney & Stephenson
agreed to get up the syndicate subscriptions to take up all the
shares that Drexel & Company failed to dispose of by October 1,
1896, at which time they would be paid cash for their shares.
Whence came the preference shares and common stock to
take up these underlying shares?   It is not disputed they were
issued by the consolidated company, delivered to Whitney &
Stephenson, who carried them to and left them with Drexel &
Company, and, whether sold for cash wherewith to lift the
underlying shares by Drexel & Company before October 1, or
after that date delivered to the syndicate subscribers, who would
furnish the cash for the same purpose, they were substantially
the consideration moving from the Consolidated Traction Com-
pany to the sellers of the underlying shares of the smaller com-
panies.   They were never purchased by Whitney & Stephenson
from anybody; they and Drexel & Company were but the con-
duit through which they, or their value, passed to those who
delivered to the consolidated company that which was necessary
to its life.   In all the documents, the correspondence and busi-
ness conduct of the parties, we fail to discover anything indicat-
ing action on the part of Whitney & Stephenson, independent of
those interested in the scheme of consolidation.   Whitney testi-
fies in support of his averment, that his firm was acting for itself,
thus, " we," meaning all those interested, proposed to acquire
control of these various properties in some way, and the Con-
solidated Traction Company got them by the assent of the people

who owned a majority of the shares. But the court below, not-withstanding Whitney's testimony, in view of other significant evidence, finds a fact which to us seems inconsistent with his finding on the whole case as heretofore quoted. ·He says: " The evidence in the case satisfies me beyond any doubt that the plaintiffs who have given testimony upon the subject did rely upon the syndicate agreement for the purpose stated, and, what is more, that under the circumstances of the case, as it must have appeared to them, they had good ground for so doing. Particularly with reference to the plaintiffs, Mr. William L. Elkins and Mr. Widener, I may say that the evidence satisfies me that Mr. Whitney did induce them to make a deposit of their underlying shares with Drexel & Co. after they had refused so to do under an arrangement which would give to Drexel & Co. or Whitney & Stephenson the option to determine whether they should be paid for those shares in cash or in preferred shares of the Consolidated Traction Company, by his undertaking on behalf of his firm of Whitney ·& Stephenson to organize the underlying syndicate, which has been already referred to." And then further on he says : " Satisfied, as I am that the plaintiffs have been misled and wronged by the acts of the firm of Whitney & Stephenson, I have yet looked in vain through the proofs for the substantial ground on which I could rest an opinion, that that firm were the agents or representatives of the plaintiffs in the transactions referred to."

It will be noticed, that the court below finds that plaintiffs, acting in a matter of the gravest financial importance to them, believed that Whitney & Stevenson were not acting for themselves, but as agents and managers of the syndicate. But the court finds this belief was not well founded and that plaintiffs were misled. Why? They were not children, destitute of common business astuteness and prudence, but were men of affairs, having knowledge of large transactions of this character; the writings and all the circumstances were consistent with the truthfulness of the representations of Whitney, and inconsistent with any other theory; the testimony of not less than six reputable witnesses, having knowledge of the project from its inception, strongly supports the same theory. The precise belief of plaintiffs as to the fact which induced them to part with their underlying shares is indicated by this excerpt from the

testimony of Mr. Widener, which is in substantial accord with that of other of plaintiffs' witnesses: " Q. You sold those shares, that is, those underlying shares of the Fort Pitt, Duquesne and Pittsburg Traction? A. I did. Q. Did you sell them to Whitney & Stephenson? A. No, sir; I sold them to Drexels and an underlying syndicate. Q. Did Whitney & Stephenson ever enter into any agreement with you to buy or pay for any of those shares? A. Not at all; only so far as their agency went in dealing with these other people. Q. I mean on their own account. A. Not at all. Q. Was there ever a moment of time at which they, by any agreements that they made with you, became responsible to you to pay for those shares? A. Never."

The documents, the circumstances, the nature and purposes of the scheme, the significant testimony of many credible witnesses with every opportunity of knowledge, all tend to establish beyond doubt that plaintiffs' belief was founded on a fact and not on a misrepresentation. There was no testimony to the contrary, except that of Whitney himself; this testimony is not consistent with the undisputed facts; it is not consistent with itself; in some particulars it contradicts the answer; inferentially, the learned judge himself discredits it; practically, the answer is without support in the evidence, while all the evidence sustains the truthfulness of the material averments of the bill.

The denial in the fourth paragraph of the answer of Drexel & Company is not reinforced by any oral testimony outside that of Whitney; it will be noticed that in the main it is based on information received from Whitney & Stephenson. But from Whitney's testimony, as early as 1895, he had interested them as assistants to Whitney & Stephenson in the project; more than once he had consulted with them on its feasibility and the means to accomplish it; when carried so far as to frame the agreements, the legal counsel of Drexel & Company were called in; in many respects they supervised and advised concerning it during the progress of the negotiations; they must have known that Whitney & Stephenson were not the owners of the underlying shares of these plaintiffs; that the value of the consolidated company's preference and common shares would depend on the deposit with them, under the agreements of the underlying shares; they knew that the 77,000 shares of common stock de-

livered to them was for their services as bankers in doing that which they failed to do, to wit: in disposing of the preference shares to raise cash for the purchase of the underlying shares, that they were to be used, not for the benefit of Whitney & Stephenson, but for the promotion of an enterprise involving many millions of dollars.

Therefore, in view of the practically uncontradicted evidence, we find the averments of fact in the second, third and fourth paragraphs of plaintiffs' bill to be true, and it is ordered that the decree of the court below be reversed, that the bill be reinstated, and that the cause be proceeded with in the court below in accordance with our finding of fact as herein stated.

It is impossible for us now to intelligently determine just what relief plaintiffs are entitled to; there are nine special prayers and one for general relief; this matter was not touched upon in the argument before us; the question discussed here was, whether the court had correctly found the fact on which depended any decree for relief. It may be that all of the special prayers ought to be granted, or perhaps only a part of them; some of them might be oppressive; we cannot tell. The court below will, without doubt, grant such as to equity shall appertain, in view of our finding of fact. It is further directed that appellees pay the costs.